"And the Jury further find, that the said Samuel Swann, being so seised of the premises, duly made and published his last will in writing, bearing date 31 October, 1766; and therein and thereby devised the said premises to his eldest son `Samuel, and the heirs of his body lawfully begotten, and for the want of such, to his second son John, and the heirs of his body lawfully begotten, and for the want of such, to his third son Stephen, and the heirs of his body lawfully begotten, and for the want of such to the child with which his wife was then pregnant (who was afterwards born and named Thomas) and the heirs of its body lawfully begotten;' and afterwards died without revoking or altering the said will.
"And the Jury, further find that after the death of the said Samuel Swann, the elder, Samuel the devisee (336) entered upon the premises by virtue of the said devise and was therefore seised; and being so seised, duly made and published in writing his last will, bearing date 24 May, 1786, and therein and thereby devised the said premises to his brother John Swann, the aforesaid second son of the said Samuel the elder, to him the said John and *Page 250 
his heirs for ever; and afterwards died without revoking or altering the said will.
"And the Jury further find, that the said John Swann,
[EDITORS' NOTE: THE DIAGRAM IS ELECTRONICALLY NON-TRANSFERRABLE.], SEE 7 N.C. 250.] *Page 251 
after the death of his said brother Samuel, entered upon the premises and was thereof seised, and being so seised, afterwards, to-wit, on 3 March, 1793, died intestate, leaving an only child, Samuel Johnston Swann, to whom the said premises descended, and he entered and was thereof seised.
"And the Jury further find, that the said Samuel Johnston Swann, afterwards, to-wit, on 11 February, 1796, died intestate and without issue, or brother or sister, or the issue of such.
"And the Jury further find, that the aforesaid Samuel Swann the younger, was the only child of his father Samuel the elder, by a first wife and that the aforesaid John Swann, Stephen Swann and Thomas Swann, were children of the said Samuel the elder by a second wife. And that after the death of the said Samuel the elder, his widow intermarried with Frederick Blount, by whom she had issue a daughter, Mary, now the wife of William Shepard of New Bern, under whom the Defendant claims the premises, and which said Mary is the nearest collateral relation of the said Samuel Johnston Swann, either paternal or maternal, the aforesaid Samuel Swann the younger, Stephen Swann and Thomas Swann the younger, being dead without issue.
"And the Jury further find, that at the time of the devise hereinbefore mentioned, from Samuel Swann the younger to his brother John, the aforesaid Thomas (337) Swann the younger was in full life.
And the jury further find, that the aforesaid Samuel Swann the younger, was at his death seized of another tract of land, which he devised to his brother, the aforesaid Thomas Swann the younger; that the value of the said tract was l2,000: and the value of the premises contained in the Plaintiff's declaration, was l6,000.
And the Jury further find, that Samuel Swann, the elder, had a brother named William Swann, and a sister, Elizabeth Vail, who are long since deceased. That the said William Swann left issue, of all whom are since dead, and of whom two only, John and Wilson have left issue. That Rebeccah, the wife of William B. Shepard, and one of the lessors of the Plaintiff, is the daughter and only child of the said John. And that Polly, the wife of Isaac Williams, and Comfort, the wife of Daniel Williams, (which said Polly and Comfort are also lessors of the Plaintiff) are the only children of the said Wilson. That Elizabeth Vail, the sister of Samuel Swann the elder, left issue Elizabeth Pemburn and Rebeccah Williamson, both of whom were in being at the *Page 252 
death of Samuel Johnston Swann, and who, afterwards, duly conveyed and released all their right, estate and interest in the premises unto Mary, the wife of William Shepard of New Bern, under whom the Defendant claims.
The Jury further find, that the demises set forth in the Plaintiff's declaration, were executed on the day, and in the manner therein set forth; and afterwards, to-wit, on the said day, by virtue of the said demises, that the said John Doe entered into the premises with appurtenances and was thereof possessed; and that the said John Doe being so possessed, the Defendant, by command of the said William Shepard of New Bern, and Mary his wife, afterwards, to-wit, on the same day, entered upon the premises with the appurtenances in and upon the possession of the said John (338) Doe thereof, and ejected him from his said farm. But whether upon the whole matter aforesaid, the said defendant be guilty of the said trespass and ejectment complained of in the said declaration, the Jury are ignorant, and thereof pray the advice and consideration of the Court.
If it shall appear to the Court, upon the whole matter, that the lessor of the Plaintiff, or any of them had title to the whole of the premises, at the date of their respective demises aforesaid, then the Jury say that the Defendant is guilty of the trespass and ejectment in manner and form as the said John Doe hath complained of, and assess the damages of the said John Doe to one shilling and costs: If it shall appear to the Court, that the lessors of the Plaintiff, or any of them, had not title to the whole, but had title to any undivided part of the premises, at the date of their aforesaid demises, then the Jury find that the Defendant is guilty of the trespass and ejectment complained of, as to such part only of the premises, and not guilty of the residue, and assess the damages of the said John Doe, to six-pence and costs: And if it shall appear to the Court, that the said lessors of the Plaintiff, nor any of them, had not, at the date of the demises aforesaid, title to the whole, nor any part of the premises, then the Jury say, that the Defendant is not guilty of the trespass and ejectment, whereof the said John Doe hath complained."
The questions of law arising out of this special verdict, were argued in this Court, in the case of "Den on the demise of William B. Shepard and Wife, and others v. Josiah Relf," in 1807. In the special verdict then sent up, an additional fact was inserted, to-wit, "That after the death of Samuel Johnston Swann, to-wit, on 30 November, 1803, his *Page 253 
mother Penelope Swann, widow of John Swann, conveyed all her right, title, interest, estate, claim and demand in and to the premises, to the said Mary, wife of the said William Shepard of New Bern." The arguments then (339) made on each side, were again relied on in this case for the respective parties: and as the decision in this case, and in the one made at this term in the case of "Ballard and others v. Hill and others," have served in a great degree to settle questions that have been long agitated, and to establish an uniform rule of descent in such cases, the arguments delivered in the case of Shepard and others v. Relf, are here given, to show the grounds of the diversity of opinion which has existed upon the construction of the act of 1784, ch. 22, regulating descents among collaterals. These arguments were delivered by Peter Browne, Esquire, for the lessors of the Plaintiff, who were the heirs at common law: and by William Gaston, Esquire, for Mary, the maternal half sister, wife of William Shepard, of New Bern, under whom Relf claimed.
This being an acquisition by purchase on the part of John and Thomas Swann, the wife of the Defendant is clearly entitled as heir, according to the several decisions which have been made to that effect. Judgment must be entered up accordingly.
DANIEL, Judge: The two tracts of land known by the name of the Elm plantation, were devised in tail by Samuel Swann the elder, to his first, second, third and fourth sons in succession. Samuel Swann the younger, the devisee, was seised and possessed of the Elm plantation at the time entails were docked by the act of 1784, ch. 22. The other tract mentioned in the special verdict, Samuel Swann the younger, held in fee.
Samuel Swann the younger made and published his last will, on 24 May, 1786, and therein and thereby devised the Elm plantation, to his brother, John Swann, in fee. John Swann is considered in law as the purchaser of this plantation, as he did not get title thereto by descent.
John Swann died intestate, leaving an only child (404) named Samuel Johnston Swann, an only maternal half sister, by the name of Rebeccah Blount (who married the Defendant) and the lessors of the Plaintiff, who are his *Page 254 
second cousins of the paternal line; all his brothers having died without issue.
Samuel Swann the younger, devised the other tract of land to his brother, Thomas Swann, in fee; and Thomas Swann the devisee, having died without issue, this tract descended to his nephew, Samuel Johnston Swann. Thomas Swann is to be considered a purchaser of this tract of land, and, as he stood precisely in the same relation to the lessors of the Plaintiff, and to the Defendant, as John Swann the younger did, the person or persons who are entitled to the Elm plantation, will be entitled to the tract devised to him.
Samuel Johnston Swann died intestate and without issue, or brothers or sisters, or the issue of such. And the question submitted to this Court is, who are the heirs of Samuel Johnston Swann?
At the common law, the heir would be searched for among the lessors of the Plaintiff. 1st. Because they are of the paternal line and of the male stock to-wit, the grandchildren of William Swann, who was the brother of Samuel Swann the elder, and great uncle of Samuel Johnston Swann, 2d. Because Mrs. Shepard is of the half blood and never could have inherited.
Samuel Johnston Swann dying without issue, or brother or sister, or the issue of such, leaves the case exactly in the same situation as if John and Thomas Swann, the purchasers, had died intestate and without issue. The same person who would have been the heir of John Swann, had he died without issue, is the heir of Samuel Johnston Swann.
The great and general principle, upon which the law of collateral inheritances depends, is this, that upon the failure of issue in the last proprietor, the estate shall descend to the blood of the first purchaser. He who would have been (405) heir to the father of the deceased, shall also be heir to the son. 2 Black. Com. 226.
When a man takes an estate by purchase, he takes it not ut feudumpaternum or maternum, which would descend only to the heirs on the side of the father or mother; but he takes it as feudom novum, to be held ut feudomantiqum, as a feud of indefinite antiquity, whereby it becomes inheritable to his heirs general, first of the paternal and then of the maternal line. The blood of the father is more worthy and more near in judgment of law. Coke Litt. 12 a. 12 b. Lord Coke says, every person has four immediate bloods in him, two on the part of the father, to-wit, his paternal grandfather's blood, and his paternal grandmothers' blood: and two on the side *Page 255 
of his mother, his maternal grandfather's blood, and his maternal grandmother's blood. If a man purchase land and die without issue, or brother or sister, or the issue of such, his eldest paternal uncle would take: If there be no paternal uncle, or the issue of such, then his paternal aunts; if there be neither, nor the issue of such, then his eldest great uncle of the line of his paternal grandfather, and so on until thatline be exhausted; always giving a preference to the male stocks. On the failure of blood or kindred in the line of the paternal grandfather, then the same rule is to be followed as to the paternal grandmother's line. If that fail, then the maternal grandfather's line is to inherit. On the failure of that line, then the maternal grandmother's line is to be sought for, and it shall inherit according to the rule aforesaid. Coke Litt. 12 b.
The case does not state, which of the lessors of the Plaintiff is the issue of the eldest son of William Swann. One of them certainly is; and that person would have been the heir of Samuel Johnson Swann at common law. Let us enquire into the changes which the Legislature has made of these rules of the common law, and into the extent and reason of those changes.
In consequence of the revolution, the people of this State formed a republican government, and it became (406) necessary in defending this form of government, that the aristocratical doctrine of primogeniture, in the descent of real estate, should be exploded, the principles contained in the statute dedonis conditionalibus be no longer enforced, joint tenancy, with its jusaccrescendi, be abolished, and the half blood, (which had been entirely excluded) let in, when it was in the line of inheritance. In short, it became necessary, for the welfare of the government, that landed estates should undergo a more general and equal distribution than had hitherto prevailed. The Legislature never meant to change or alter the stocks orgenealogical lines, from what they were known to be at the common law. The stocks and lines remain the same, with the addition of the half blood, when in those lines, together with the ascent of real estates in certain cases.
It is in general true, that the preamble of a statute is a key stone to open the minds of the makers, as to the mischiefs intended to be remedied by the statute. But this rule must not be carried so far as to restrain the general words of an enacting clause, by the particular words of the preamble. The preamble to every section of the act of 1784, ch. 22, *Page 256 
clearly explains the intention of the Legislature. The preamble to the 2d section, shews the will of the Legislature to promote an equality of property, by a more general and equal distribution of landed estates; or in other words, to destroy the rule of primogeniture — the second section then lets in all the sons: on failure of them and their issue, it lets in all the daughters. The preamble to the third section complains only of the exclusion of the half blood from the inheritance; the section then lets in the half blood, but does not destroy the stocks or lines, as established by the common law. There is no complaint of the common law stocks and lines. The section declares (though certainly in terms not very clear) that the old rule relative to stocks and lines shall remain; but that the half blood shall inherit (407) equally with the whole blood, when it is found in those lines, and in equal degree. And it clearly intimates by the proviso, that the half blood shall not inherit when out of the common law stocks or lines, although in equal or in a nearer degree. Thus when land descends on the side of the father to a son, afterwards the son dies without issue, but has a half blood brother on thematernal side, and an uncle or more remote relation of the whole or half blood, on the paternal side: the relation next in degree on the paternal
side, shall inherit, to the exclusion of the maternal half brother: because, 1st. He is of the blood of the first purchaser.2d. The proviso to the third section expressly enacts, that the maternal half brother shall not inherit, until such paternal line be exhausted of the half blood, (and of course, of the whole blood.) The maternal brother is not to be let into the inheritance as soon as the paternal line is exhausted of brothers and sisters: the act says, he shall not inherit until the paternal line beexhausted of the whole and half blood. Heirs shall be sought for on thatline ad infinitum, before any of the maternal kindred shall inherit, no matter how near in degree. And the same rule e converso, when land shall descend on the maternal side. The paternal kindred shall be excluded as long as any whole or half blood can be found on the maternal side, let it be ever so remote.
The fourth section extends the rules laid down in the second section relative to lineal descendants, and, in the third section, relative to collateral relations ad infinitum.
That this is the most proper construction, will manifestly appear from reading the rules of the common law, and then the third and fourth sections of the act of 1784, ch. 22. This construction does not clash with any of the grand objects *Page 257 
which were in the view of the Legislature at the time the act was passed; but runs in unison with them. It is agreeable to justice that those who are of the blood of him who has labored for and purchased the land, should inherit, and not a stranger. If this construction be not adopted, the land might descend to a stranger in two changes; (408) to-wit, A purchases land, and dies, leaving a son B. The widow marries again, and has a son C. B dies without issue, and the lands descend to C, his maternal half brother, who is not of kin to A, thefirst purchaser. Such a construction was never intended by the Legislature. The kindred of A, the first purchaser, shall be preferred, no matter how remote; otherwise industry would be cramped, and men become careless of acquiring estates.
The preamble to the fifth section complains of entails; and the section docks all entails that are in possession, and turns them into fee simple estates.
The preamble to the sixth section complains of the injustice to the family of that joint tenant who shall die first. The section abolishes the principle of survivorship, and turns all joint tenancies into tenancies in common, with one exception.
The preamble to the seventh section complains of the rule which forbids the inheritance ever to ascend. "When lands are purchased, or otherwise acquired," (but not by descent from a deceased parent,) "and the owner dies without issue, or brother or sister, or the issue of such," then the seventh section of the act of April, 1784, and the third section of the act of October, 1784, let in the father first; and, if he be dead, then themother for life; and then the heirs on the part of the father; and, if none on his side, (ad infinitum, then the heirs on the part of the mother.
The reason given for this rule by the Legislature is, that the paternalline is favored in all instances.
Mrs. Shepard, the wife of the Defendant, is heir to the lands in dispute, because she is next in the degree of the bloodof the purchasers, John and Thomas Swann, being a sister: and although of the half blood, the third and fourth sections of the act of 1784, make her capable of inheriting. But if Mrs. Shepard should die without issue, then the next heir to these lands would not be of her father's line, (the Blount family), because none of the blood of the purchasers can be found in that line. They must be the (409) persons who are next in degree and of the blood of John and Thomas Swann: 1st. of the paternal line, (and these would be the lessors of the Plaintiff,) and when that line is *Page 258 
exhausted, then 2dly, the maternal line of John and Thomas Swann shall inherit, as they shall be nearest in degree, until it shall be exhausted; always giving preference to the paternal or male stocks, as known at the common law; and is clearly intimated by the seventh section of the act of April, 1784, and positively declared by the third section of the act of October, 1784. Let judgment be entered for the Defendant.
Cited: Hilliard v. Outlaw, 92 N.C. 268. (410)